**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———————

No. 09-3156

———————

UNITED STATES OF AMERICA

v.

LORENZO LIBURD, Appellant

———————

On Appeal from the District Court
of the Virgin Islands
District Court  No. 3-08-cr-00057-001
District Judge: The Honorable Curtis V. Gomez

———————

Argued May 5, 2010

Before: SMITH, CHAGARES, and JORDAN, *Circuit Judges*

(Filed: June 9, 2010)


Everard E. Potter, Esq. (argued)
Office of United States Attorney
5500 Veterans Building, Suite 260

Charlotte Amalie, St. Thomas, Virgin Islands 00802
    *Counsel for Appellee*

Thurston T. McKelvin, Esq. (argued)
Jesse A. Gessin, Esq.
Office of the Federal Public Defender
P.O. Box 223450
Christiansted, St. Croix, Virgin Islands 00822
    *Counsel for Appellant*

---

OPINION

---

SMITH, *Circuit Judge.*

A jury convicted Lorenzo Liburd of violating 21 U.S.C. § 841 and attempting to violate 21 U.S.C. § 952(a). Liburd appeals, arguing that his trial was marred by prosecutorial misconduct which denied him due process of law. We agree, and will vacate the judgment of conviction.

I.

On October 4, 2008, Liburd entered Cyril E. King Airport on St. Thomas, United States Virgin Islands, with the intention of boarding a flight to Atlanta. He passed through the airport's Customs and Border Protection and agricultural checkpoints

2

without incident. At the Transportation Security Administration ("TSA") checkpoint, however, an X-ray scan revealed two large organic masses in his carry-on bag. TSA Officer Tamika Martin, who was operating the scanner, referred Liburd to fellow Officer Wendell Grouby for further inspection. Grouby's job was to check for "large amounts of liquids, weapons, [and] anything harmful to the plane or passengers." He was not trained to detect narcotics. Grouby found two suspicious, rectangular, brick-like objects in Liburd's bag. Liburd told him that the bricks were cheese. (We will refer to this claim as the "Cheese Statement.") Cheese was not, for Grouby's purposes, a prohibited substance, so he left the bricks in the bag and proceeded with his inspection. He also found a white plastic bag containing two bottles of shampoo, which he discarded because they were not allowed on the flight. Liburd eventually cleared the checkpoint and proceeded to the waiting area.

While Liburd stood in line for his flight, TSA Officer Josina Green approached him for a random inspection. According to Green, Liburd appeared nervous, avoided eye contact, and would not respond to her initial request to step out of line. Green directed him to TSA Officer Eric Brown for inspection. While Brown searched Liburd's carry-on bag, Liburd uttered something along the lines of, "there's something in my bag." Brown's search uncovered two bricks which, combined, contained more than two kilograms of cocaine. Liburd was arrested and charged with possession with intent to distribute 500 grams or more of cocaine, in violation of 21

3

U.S.C. § 841(a)(1) and (b)(1)(B)(ii)(II), and attempted importation of the same, in violation of 21 U.S.C. §§ 952(a) and 963. In pre-trial discovery, the government disclosed evidence concerning the statement, "there's something in my bag," but it disclosed nothing about the Cheese Statement.

Liburd moved to suppress both the cocaine and any statements he had made, including the statement, "there's something in my bag." The District Court asked the prosecutor, Everard Potter, whether the government intended to introduce that statement at trial. Potter's response was unequivocal:

> Potter:    No, Your Honor. Any statement that Mr. Liburd may have made was made prior to any Miranda warnings being given.
>
> The Court:    So you don't intend – you don't intend to rely on that, or present the statement?
>
> Potter:    I don't intend to rely on *any statement that Mr. Liburd made*.

4

The Court twice confirmed with the parties that Liburd's statement was "off the table," and based on that understanding, declined to rule on that aspect of the motion to suppress.

At trial, Liburd argued that he did not know that there were bricks of cocaine in his bag. He theorized that someone else—possibly a suspicious-looking ramp agent observed near the scene of his arrest—had slipped the bricks into his bag sometime after he cleared the TSA checkpoint. Of course, that theory suffered from two major weaknesses. The first was Officer Martin's testimony that the X-ray scan at the TSA checkpoint revealed two large brick-like organic masses in Liburd's bag. The second was the fact Liburd had acknowledged that there were bricks in his bag, and told Officer Grouby that they were cheese. Both facts undermined Liburd's contention that there were no bricks in his bag when he passed through the TSA checkpoint. Recognizing the first weakness, Liburd posited that the "masses" revealed by the TSA X-ray scan were not bricks of cocaine but rather the shampoo bottles that Officer Grouby discarded. While that theory could not explain the Cheese Statement, Potter had promised not to introduce anything Liburd said before his arrest. So long as that promise was kept, the jury would never hear about the Cheese Statement, and Liburd's theory remained plausible.

Unfortunately, Potter wasted no time in breaking his promise. In his opening statement, he noted that Liburd told Officer Grouby that the bricks in his bag were cheese. Liburd

objected. At sidebar, Potter reiterated that he had "no intention of introducing anything that [Liburd] said." With the issue apparently laid to rest, the trial proceeded. The next witness was Officer Grouby, who testified that he found two suspicious rectangular objects in Liburd's bag and that he determined that those objects were blocks of cheese. Potter asked, "how did you come to the conclusion that the masses were blocks of cheese?" Over Liburd's objection, Grouby testified that "the passenger" (i.e., Liburd) told him so. Potter pursued the same line of questioning on redirect examination, blatantly prompting Grouby to remind the jury about the Cheese Statement:

> Q. Okay. Why, sir, didn't you remove the brick-like items from the defendant's bag?
>
> . . . .
>
> A. To the best of my recollection . . . from what I remember, I was led to believe that those two rectangular items were blocks of cheese.
>
> Q. Who led you to believe that, sir?
>
> A. The passenger.

Liburd moved for a mistrial, arguing that Potter's deliberate elicitation of testimony about the Cheese Statement unfairly

prejudiced his defense. He also faulted the government for not disclosing the Cheese Statement in pre-trial discovery.

Potter admitted that the Cheese Statement had not been disclosed, but claimed that he had only learned of it on the eve of trial. When the Court reminded him of the promise he made at the suppression hearing, Potter responded that his promise not to "rely on any statement that Mr. Liburd made" referred only to the statement, "there's something in my bag." He insisted that it was not meant to exclude "every single thing that Mr. Liburd may have said to an agent at the time that he was at the Cyril E. King Airport." The Court was skeptical, rightly noting that Potter's promise at the hearing was "pretty sweeping and broad." Nevertheless, it declined to grant a mistrial.[1] Instead, the judge instructed the jury as follows:

> During the course of this trial, you have heard certain statements attributed to the defendant regarding cheese in the defendant's bag. Those statements are improperly before you. You are therefore instructed to disregard any such statements in their entirety. That means, that you may not consider such statements in any form or

---

[1] The Court denied Liburd's motion for a mistrial because it viewed its curative instruction as sufficient, and did not believe that the government's use of the Cheese Statement was willful or prejudicial.

fashion.

Liburd was convicted on both counts and sentenced to 82 months in prison. He raises several arguments on appeal, but his primary argument is that the prosecutor's use of the Cheese Statement was misconduct; that this misconduct violated his right to due process; and that the District Court erred by refusing to grant a mistrial once the Cheese Statement was introduced.[2]

II.

We exercise jurisdiction under 28 U.S.C. § 1291. We review Liburd's claim that the District Court improperly denied his motion for a mistrial for abuse of discretion. *See United States v. Rivas*, 493 F.3d 131, 139 (3d Cir. 2007). However, our review of the underlying legal issue—whether Potter's conduct deprived Liburd of due process—is plenary. *United States v. Dees*, 467 F.3d 847, 854 (3d Cir. 2006). Our analysis proceeds in two stages. First, we must determine whether Potter

---

[2] Liburd also argues that the prosecutor improperly shifted the burden of proof in his closing argument; that the District Court improperly limited his cross-examination of government witnesses; and that the Court abused its discretion by replacing an unruly juror with an alternate during deliberations. In light of our holding concerning the government's use of the Cheese Statement, we need not reach any of those issues.

8

committed misconduct. Because we conclude that he did, we will proceed to consider the due process implications of that misconduct.

## A.

Liburd argues that Potter's use of the Cheese Statement at trial was misconduct because it violated his promises not to introduce evidence of anything Liburd said at the airport. We agree. Potter's pre-trial promise not to rely on "any statement" Liburd made required him do exactly that. Instead, he invoked the Cheese Statement three times: once in his opening statement and then twice more in his examination of Officer Grouby. This was plainly improper.

The government emphasizes that it did not know about the Cheese Statement at the suppression hearing, and argues that it could hardly have promised not to rely upon evidence of which it was unaware. It maintains that at the suppression hearing, it merely promised not to use the statement, "there's something in my bag," and points out that it kept that promise. As an initial matter, we reject the premise that a prosecutor could never make a promise governing his future use of as-yet-undiscovered evidence. But we note also that the government's argument fails even on its own terms. Potter's promise at the suppression hearing may have been made in ignorance of the Cheese Statement, but the same cannot be said of the identical pledge he made—then immediately broke—during trial.

9

Nor do we accept the government's argument that Potter's actions were somehow acceptable because neither Fed. R. Crim. P. 16(a)(1)(A) nor the Jencks Act, *see* 18 U.S.C. § 3500, required pre-trial disclosure of the Cheese Statement. Such a contention may be true, but it is also irrelevant.[3] Use of the Cheese Statement was not improper because the government failed to disclose that statement; it was improper because the government breached an unambiguous promise not to use "any" statement Liburd made. Prosecutors routinely enter into agreements with defendants—and make representations to the court—that exceed their minimum obligations under the law. Whether they do so strategically or for reasons of convenience is of no moment. Once prosecutors undertake such commitments, they are bound to honor them. *See, e.g.*, *United*

---

[3] We note that, on the present record, the context in which the Cheese Statement was made is unclear. It is possible that it could fall within the ambit of Federal Rule of Criminal Procedure 16(a)(1)(A), which requires the government to disclose any statements made by the defendant "before or after arrest, in response to interrogation by a person the defendant knew was a government agent if the government intends to use the statement at trial." *But see United States v. Scott*, 223 F.3d 208, 212 (3d Cir. 2000) (stating that Rule 16(a)(1)(A) does not require the government "to provide discovery of a defendant's unrecorded, spontaneous oral statements not made in response to interrogation."). Liburd takes the position that there was no discovery violation here, and we will accept that as true for purposes of our analysis.

*States v. McKinney*, 758 F.2d 1036, 1046 (5th Cir. 1985) ("[A]greements between the Government and a defendant to forego the presentation of otherwise admissible evidence are enforceable.");[4] *United States v. Jackson*, 621 F.2d 216, 220 (5th Cir. 1980) (stating that "when the government and a defendant enter into a pretrial agreement both parties are entitled to rely upon that agreement in preparing their respective cases").

B.

The rights guaranteed by the Fifth Amendment to the United States Constitution have been extended to the Virgin Islands. *See* 48 U.S.C. § 1561. Among those rights is the right to due process of law, which encompasses the right to a fair trial. *See, e.g.*, *United States v. Augurs*, 427 U.S. 97, 107 (1976); *United States v. Gatto*, 995 F.2d 449, 455 (3d Cir. 1993).

---

[4] The District Court may, in its discretion, release a party from a pre-trial agreement of this nature but only if (1) the repudiating party supplies reasonable notice and (2) "the prejudice that will flow from the release is outweighed by the reasons justifying it." *McKinney*, 758 F.2d at 1047. *See also United States v. Laboy*, 909 F.2d 581, 586 (1st Cir. 1990). Here, the government never sought release from its promise when it learned about the Cheese Statement. Quite the opposite; it reaffirmed that promise at sidebar after Liburd objected to Potter's opening statement.

11

Not all prosecutorial misconduct violates this right. "[T]he practicalities of judicial administration . . . preclude us from reversing a jury verdict every time" a prosecutor commits misconduct. *Gov't of the Virgin Islands v. Joseph*, 770 F.2d 343, 349 (3d Cir. 1985). "To constitute a due process violation, the prosecutorial misconduct must be of sufficient significance to result in the denial of the defendant's right to a fair trial." *Greer v. Miller*, 483 U.S. 756, 765 (1987) (internal quotations omitted). "It is not enough that the prosecutor's remarks were undesirable or even universally condemned." *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (internal quotations omitted). The touchstone of our inquiry is "not the culpability of the prosecutor" but the fairness of the trial. *Smith v. Phillips*, 455 U.S. 209, 219 (1982); *see also id.* ("[T]he aim of due process is 'not punishment of society for the misdeeds of the prosecutor but avoidance of an unfair trial to the accused'"). We must determine whether the misconduct "so infected the trial with unfairness as to make the resulting conviction a denial of due process in light of the entire proceeding." *United States v. Morena*, 547 F.3d 191, 194 (3d Cir. 2007) (internal quotations omitted). In making this determination, we examine the curative instructions, if any, given by the trial court; the weight of the properly admitted evidence against the defendant; and the prosecutor's improper actions. *Id.*

The first factor of this test weighs in favor of upholding Liburd's conviction. The District Court properly instructed the jury to ignore all testimony about the Cheese Statement, and

12

while curative instructions cannot repair every error, we do generally presume that juries follow their instructions. *United States v. Lee*, 573 F.3d 155, 163 (3d Cir. 2009). The second factor seems to point in the same direction. Even if we set aside the Cheese Statement as evidence that was not "properly" admitted, the evidence of Liburd's guilt was not insubstantial. Officer Martin testified that Liburd entered the TSA checkpoint with a carry-on bag containing two objects that appeared on the X-ray machine as square, organic masses. Officer Grouby likewise testified that Liburd's bag contained one or two "suspicious," brick-like, rectangular masses, and that those masses were not shampoo bottles. Officer Green testified that Liburd appeared nervous in the waiting area, and evaded her requests to step out of line for inspection. Officers Brown and Green both testified that they found brick-like objects inside of Liburd's bag, and it was undisputed that those bricks contained cocaine. In short, there was ample evidence that Liburd possessed bricks of cocaine when he passed through the TSA checkpoint, and that those bricks were not, as he claimed at trial, slipped into his bag in the waiting area.

"[T]he quantum or weight of evidence is crucial to determining whether . . . [prosecutorial misconduct was] so prejudicial as to result in a denial of due process." *Moore v. Morton*, 255 F.3d 95, 111 (3d Cir. 2001). "When the evidence is strong, and the curative instructions adequate, the Supreme Court has held the prosecutor's prejudicial conduct does not deprive a defendant of a fair trial." *Id.* at 113. We applied this

13

rule in *Joseph*, where the prosecutor's closing argument improperly attacked the defendant's credibility and the defendant claimed on appeal that those comments violated his right to due process. 770 F.2d at 349. Despite the impropriety of the prosecutor's remarks, we upheld the conviction because "the proof of Joseph's guilt . . . was ample" and the District Court had given a curative instruction concerning the improper conduct. *Id.* We stated that "[i]f our review of the record convinces us that the jury would have convicted the defendant even had it not been exposed to the allegedly improper prosecutorial comments, we must conclude that no actual prejudice accrued." *Id.* at 350. It may be thought that the same result should follow here, for as explained above, the evidence against Liburd was fairly strong.

But our polestar is no more Liburd's culpability than it is Potter's. It is the fairness of the trial, and we think that the nature of "the prosecutor's improper actions" here made a fair trial impossible. *Morena*, 547 F.3d at 194. In *Joseph*, the prosecutor's misconduct arose only at the end of the trial. It in no way shaped the development of the record evidence we evaluated, or the trial strategy pursued by either party. This case is entirely different. Potter's promise at the suppression hearing not to introduce "any" statements Liburd made influenced Liburd's strategic decisions—and therefore the record evidence

14

before us—from the outset.[5]   But for Potter's promise, Liburd almost certainly would have chosen a trial strategy with a better chance of success, or might well have opted for a negotiated plea of guilty.  Indeed, Liburd's trial strategy must have been crafted with Potter's promise in mind.  His theory of the case was that someone slipped the cocaine into his bag after he passed through the TSA checkpoint, and that the "objects" Officer Martin saw on the X-ray machine were the bottles of shampoo that Officer Grouby later discarded.

The Cheese Statement obliterated this theory.  Evidence that Liburd had acknowledged having bricks of *something* in his bag all but disproved his claim that his bag contained only shampoo.  Few juries, we imagine, would accept that a TSA inspector would mistake bottles of shampoo for bricks of cheese.  If there was any room for doubt on this point, however, Grouby buried it when he testified that the bottles of shampoo in Liburd's bag were *not* the same objects as the bricks of "cheese." In other words, even if jurors were inclined to believe that the masses revealed by the X-ray scanner were shampoo, they still would have been left with an obvious question: what were the bricks that Liburd told Grouby were cheese?  Liburd had no answer, because he was led to believe that he would not need one.  If he had known that the jury would hear about the Cheese Statement, however, surely he would have adjusted his

_____

[5]   It also persuaded the District Court to forego a ruling on Liburd's motion to suppress.

15

strategy accordingly. *Cf. Lee*, 573 F.3d at 165 (finding prejudice from government's failure to disclose evidence before trial because "[a]bsent the discovery violation, [the defendant] would have likely crafted a different trial strategy that might have proven more effective"); *California v. Trombetta*, 467 U.S. 479, 485 (1984) (due process requires a "meaningful" opportunity to prepare a defense).

We decline to countenance Potter's misconduct simply because the record contains enough evidence from which a jury could have found Liburd guilty. Indeed, we must discount the utility of that evidence to our analysis because the entire trial record was corrupted by Potter's misconduct. If Liburd appears guilty from this record, that may only be because he was lulled into pursuing a defense that was dead on arrival once Potter broke his promise. Potter's broken promise literally "infected" everything that unfolded at trial with unfairness. *Morena*, 547 F.3d at 194.

We cannot know what defense Liburd would have chosen absent Potter's misconduct, or how that defense would have measured up to the government's evidence. Nor can we know if he would have chosen to go to trial at all. We decline to speculate. We know only that the defense he chose under the circumstances could not and did not survive Potter's ambush. We cannot sustain a conviction obtained in this manner.

16

## III.

Potter's use of the Cheese Statement "so infected the trial with unfairness as to make the resulting conviction a denial of due process[.]" *Id.* We will vacate the judgment and remand for further proceedings. We express no view on the Double Jeopardy implications of Potter's actions.