**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

Nos. 07-4114/4182/2765

UNITED STATES OF AMERICA

v.

NANCY ELGENDE, a/k/a, NANCY MIRANDA,

Appellant in No. 07-4114.

UNITED STATES OF AMERICA

v.

JOSE RIOS,

Appellant in No. 07-4182.

UNITED STATES OF AMERICA

v.

ALTAGRACIA ROSARIO, a/k/a, "GRACE,"

Appellant in No. 07-2765.

On Appeal from the United States District Court
for the District of New Jersey
( D. C. Nos. 1-06-cr-00414-1; 06-cr-00414-3; 1-06-cr-00414-6)
District Judge:  Hon. Joseph E. Irenas

Submitted under Third Circuit LAR 34.1(a)
on May 13, 2009 and May 14, 2009

Before:  AMBRO and ROTH, <u>Circuit Judges</u>
and FISCHER[*], <u>District Judge</u>

(Opinion filed June 10, 2010)

O P I N I O N

**ROTH**, <u>Circuit Judge</u>:

## I. **Introduction**

This appeal by Altagracia Rosario concerns the appropriate remedy for juror misconduct discovered at an early stage in a trial.[1]  After *voir dire* and the prosecution's opening statement, the District Court learned, near the conclusion of the cross-examination of the government's first witness, that two jurors, contrary to the court's instructions, had been discussing the case among themselves.  The attorney for one of the defendants requested that the court question jurors about the misconduct.  The court

---

[*] Honorable Nora Barry Fischer, United States District Judge for the Western District of Pennsylvania, sitting by designation.

[1] This opinion covers the appeals of Rosario's co-defendants Jose Rios and Nancy Elgende, as well as that of Rosario herself.  Elgende adopts the arguments Rosario makes in her brief on appeal.  To the extent that Rios argues additional issues in his *pro se* letter to the Court and does not adopt Rosario's arguments, we dismiss those additional claims as meritless.  Finding no non-frivolous issues on appeal, we will affirm Rios' conviction.  We have issued three separate orders for the defendants with this opinion.

refused, choosing instead during the remainder of the trial to issue multiple instructions to the jurors not to discuss the case among themselves until the appropriate time.

The trial proceeded, and the defendants were convicted of conspiracy to produce more than five identification documents in violation of 18 U.S.C. § 1028(a)(1), (b)(1)(B), and (f). The government's evidence included testimony from six Bureau of Immigration and Customs Enforcement (ICE) agents, a Pennsylvania Department of Transportation (PennDOT) operations manager, an informant, and several alien clients of the defendants. Other evidence included extensive documentation, recorded telephone conversations between the defendants, bank records, and surveillance photos and videotapes.

We conclude that any error the District Court may have made by refusing to conduct a hearing about the nature and extent of the jurors' discussions was harmless because the evidence of the defendants' guilt was overwhelming. Rosario and Elgende additionally make an ineffective assistance of counsel claim, which we reject because again they cannot show prejudice. Accordingly, we will affirm the judgment of the District Court.

## II. **Factual Background and Procedural History**

The defendants, Altagracia Rosario, Ronald Henry, Nancy Elgende, Lizette Mahsel, Chris Nix, and Jose Rios, were involved in a conspiracy to procure fraudulent Pennsylvania driver's licenses. The overarching conspiracy lasted from July 2003 through September 2005. Defendants' clients were aliens. Defendants created fictitious visas and other immigration documents, such as social security cards and altered

3

passports for clients, at Rosario's home in Robinsville, New Jersey. Rosario was the ring leader. With the defendants' help, the clients would present the fake documents to the PennDOT office in Bensalem, Pennsylvania, to obtain valid driver's licenses. The defendants charged clients as much as $5,000. Over the course of the conspiracy, there were approximately 150 deposits, totaling over $190,000, made into five separate bank accounts that Rosario maintained. The conspiracy was uncovered by ICE, using an informant and court-authorized wiretaps.

On May 30, 2006, a federal grand jury indicted the six defendants on one count of conspiracy to produce more than five identification documents in violation of 18 U.S.C. § 1028(a)(1), (b)(1)(B), and (f). A superseding indictment against the defendants was issued in January 2007, expanding the time frame of the conspiracy.

On May 7, 2007, jury *voir dire* commenced in the consolidated trial of Rosario, Elgende, Rios, and Henry.[2] *Voir dire* took place on May 7 and May 8. On May 7, at the beginning of *voir dire*, the District Court instructed the prospective jurors not to discuss the case with each other.

On May 9, the court gave the jury preliminary instructions prior to opening statements. In its instructions, the court told the jury not to discuss the case with each other or anyone else prior to the conclusion of the evidence. The court stated:

> Now, during the course of this trial, you should not talk about this trial with anyone else, not your spouses, not your children, not your

---

[2] Henry pled guilty part-way through trial.

relatives, not your co-employees, not friends, strangers, don't talk to them about anything at all about this case. . . .

Now, I've also told you already do not discuss the case among yourselves. Because you're going to spend some time together now, these are going to be your close friends soon, you know, in the jury room or elsewhere, please don't discuss the case among yourselves. Wait till you've heard all the evidence, you've heard all the arguments of counsel, then you'll get your shot at it and discuss it at great length. But until that time, keep an open mind. Okay? I wish I could dump all the evidence like in one second. The trouble is it comes in over a period of time and what you may hear the first day, gee, that sounds good, and then the second day you'll hear something that makes you think differently. And I don't want you to express an opinion so strongly that psychologically you don't want to back off[,] even if the evidence should suggest to you [that] you should back off. You know, keep an open mind. And one of the ways to do that is not to discuss the case among yourselves.

After opening statements, the government presented its first witness, DHS Special Agent Patrick Glynn. Glynn testified about two transactions he supervised between Rosario and a cooperating witness, in which Rosario provided the witness with falsified identity documents and helped the witness obtain a driver's license and a commercial license. The government also presented video surveillance of the portion of those transactions that took place in the PennDOT parking lot.

The following day, May 10, near the conclusion of Glynn's cross-examination, the court held a sidebar conference. The court told counsel that premature jury deliberations appeared to have occurred. Juror 1 had passed an unsigned and undated note to the deputy clerk concerning jurors 5 and 6. The transcript of the sidebar is as follows:

The court: Let me raise another issue while you're here. One of the jurors – you say it's – what juror number?

5

Clerk:  Carmelita Mayes [juror 1].

The court:  She wrote a note.  I'll read it for the record. ["]Jurors 5 and 6 were talking in great detail about trial with very strong opinions.["] Not signed.  Not dated.  Handed to –

Clerk:  Me on the way into the courtroom.

The court:  Let me tell you how I plan – I do not plan – I don't believe it's reversible error.  If every trial were reversed when a juror discussed the case, every trial would be reversed.  I do it to keep pounding away at them to keep an open mind.  I'm going to give them an especially strong instruction.  If I call her out – I don't think the defense wants to lose her to my guess.  I don't want to start questioning her about what the jurors said, I think that intrudes into the jurors' province.

Henry's counsel:  Your Honor –

The court:  His mind is worrying where is the possible error that can be created here.

Henry's counsel:  She's telling us two of the jurors already have strong opinions about the case.

Counsel for the government:  I think it says about trials.

The court:  It says detail about trial.

Counsel for the government:  Oh.

The court:  With very strong opinions.  She doesn't say opinions about the case.  It could be about the lawyers. [For example:] He's terrific.  Not only is he handsome but very, very articulate.

Counsel for the government:  Do you know who he's talking about, Mr. Borden?

The court:  Or what law school did he go to.

Henry's counsel:  This bozo.

The court: And where in the world did he get that suit. So I don't know, you can have strong opinions about all kinds of things.

Henry's counsel: Well, they say it's about – your Honor, candidly I think it's about the substance of the case.

The court: No, I don't think it's a fair statement. For the record do you want to create a little error, do you want to make an application?

Henry's counsel: My application is the jurors be questioned.

The court: I'm going to deny that. If every time someone came and said a juror discussed the case, every single trial – the fact that they let jurors ask questions means the jurors have to be discussing the case to give it. I like to do it because it's my way of pounding away at keeping an open mind, but I'm going to make that especially strong this time but I'm not going to question the jurors about it. Once I start – this jury has been sworn. If I start questioning them about what they heard or what they thought about something, that ruins this jury and I'm not going to do it. So your application is denied.

Henry's counsel: Yes, sir.

Rather than grant Henry's counsel's request that the jurors be questioned, the court issued a cautionary instruction. Counsel for Elgende, Rios, and Rosario were present at the sidebar but did not participate in the discussion or explicitly join in the application.

The jury instruction was as follows:

The court: Ladies and gentlemen of the jury, I'm not talking to myself, am I? I mean, I'm talking to you, aren't I? Don't discuss the case among yourselves. Don't express opinions about what's going on in the case. Please keep an open mind. It's very hard to do and I recognize it's hard to do. . . . But you have to keep an open mind. If two, three, four of you are discussing something and the others are following my rule, it becomes – the jury as a whole wants to come together and not be apart. If two people or three people or four people are discussing something and the other jurors are keeping their thoughts to themselves, it creates a bad kind of karma, I can't even translate that, a bad feeling among the jurors. And I urge all of

7

you, all of you, please let's keep an open mind. . . . [discussion on the piecemeal way evidence comes in at trial] So wait till you hear [all of the evidence] and then you can, you'll get a chance to express your opinions without reservation when you go to deliberate your verdict. So humor an old man. And I think 800 or 900 years of history has shown us that it works best and yields the fairest kind of trial.

At the conclusion of that same trial day, the court told the jury:

The court: Please do not discuss the case with your family, friends, loved ones, space aliens, bus drivers, nobody that you come across in your life. Please don't discuss the case with anybody. And, as I told you last time, don't discuss the case among yourselves. Please keep an open mind until you've heard all the evidence.

The trial continued and the court briefly reiterated this instruction throughout the subsequent nine days of trial. During trial, the juror note and the subsequent sidebar conversation were the only mentions of the premature deliberations.

The evidence presented by the government was overwhelming, including testimony from six ICE agents, a PennDOT operations manager, the informant, and several alien clients of the defendants. Also, the government presented extensive documentation, recorded telephone conversations between Rosario and Henry, bank records, and surveillance photos and videotapes. The jury rendered a guilty verdict against all three defendants on May 29, 2007.

## III. Jury Misconduct[3]

---

[3] The government urges us to adopt a plain error standard of review for the District Court's investigation of jury misconduct because it is not clear from the record that all attorneys, including Rosario's, joined in Henry's attorney's request for the jurors to be questioned. *See United States v. Brennan*, 326 F.3d 176, 182 (3d Cir. 2003) ("Any non-contemporaneous objections are subject to plain error review."). The alternate standard

Rosario and Elgende on appeal claim that the District Court improperly denied the request for individual juror questioning to determine the extent of the improper discussion. They suggest that, because of this error, they are entitled to a new trial. We will not grant a new trial because, even if the court did err in not holding a hearing to determine the extent of the jury discussions, the error did not cause prejudice. The evidence against the defendants was overwhelming. Accordingly, any error was harmless.

To justify granting a new trial, generally a defendant must show not only that there was misconduct by a juror but also that the misconduct resulted in substantial prejudice to the defendant so that the right to a fair trial was impeded. *See Gov't of V.I. v. Dowling*, 814 F.2d 134, 138 (3d Cir. 1987). When considering whether a new trial would be appropriate, we make our "determination on the basis of an objective analysis by considering the probable effect of the allegedly prejudicial information on a hypothetical average juror." *United States v. Gilsenan*, 949 F.2d 90, 95 (3d Cir. 1991). Prejudice is not a precisely defined concept but depends on the particular circumstances in the case.

We recognize that a trial court is in a better position than we are to observe the

of review that may be applicable is abuse of discretion. *See United States v. Bertoli*, 40 F.3d 1384, 1392 (3d Cir. 1994) (noting that the Third Circuit reviews a district court's investigation of jury misconduct for abuse of discretion). We need not reach either the issue of whether all the defendants shared in Henry's objection or the issue of which standard of review applies. Regardless of the standard, plain error or abuse of discretion, any error by the District Court was harmless because evidence of guilt against Rosario and the other defendants was overwhelming.

9

impact of the juror misconduct and to make a determination as to the effectiveness of a cautionary instruction. *See Bertoli*, 40 F.3d at 1393–94. For this reason, a trial court generally has discretion to decide how to deal with juror misconduct. *See United States v. Resko*, 3 F.3d 684, 690 (3rd Cir. 1993). Nevertheless, we must be satisfied upon review that "the district court meaningfully . . . assess[ed] the nature and extent of the jurors' premature discussions in order to ascertain whether there has been any prejudice to the defendants." *Id.*

Rosario and Elgende rely exclusively on our analysis in *Resko* to support their argument. They incorrectly contend that we established a "bright-line rule" in *Resko* "that when intra-jury misconduct occurs, individualized questioning must occur and in the absence of that questioning neither the district court nor the Appellate Court can conclude with any certainty whether or not the defendant was denied her constitutional right to a fair trial and due process of law." Thus, in this case, Rosario and Elgende suggest that the juror note automatically required juror examination.

We have recognized that extra-jury influences are most detrimental to the right of a defendant to a fair trail by an impartial jury, but intra-jury communications are no less threatening to a defendant's Fifth and Sixth Amendment trial rights. *See Resko*, 3 F.3d at 690. In this case, however, we need not decide whether the District Court was required to conduct individual questioning of the jurors because, even if it erred in not doing so, neither Rosario nor Elgende suffered prejudice. The evidence against them overwhelmingly demonstrates their guilt in orchestrating the false identity scheme. With

such substantial evidence pointing to the defendants' guilt, we cannot say that they were prejudiced by the District Court's failure to conduct an individualized assessment of the juror conversations.

## IV. Remaining Claims

Rosario and Elgende also raise an ineffective assistance of counsel claim, which we generally do not review on direct appeal because collateral review "allows for adequate factual development of the claim." *United States v. Morena*, 547 F.3d 191, 198 (3d Cir. 2008). Here, there is no reason to delay review because, in light of the overwhelming case against Rosario and Elgende, they cannot demonstrate the necessary prejudice. *See Strickland v. Washington*, 466 U.S. 668, 692 (1984) ("[A]ny deficiencies in counsel's performance must be prejudicial to the defense in order to constitute ineffective assistance under the Constitution."). Accordingly, we will deny the ineffective assistance of counsel claim.

In a *pro se* supplemental brief filed shortly before oral argument in this appeal, Rosario raised the following nine new bases for relief: (1) warrantless seizure and seizure with a defective warrant; (2) violation of her right to a speedy trial; (3) property seizure beyond the scope of the warrant; (4) property illegally subject to an administrative forfeiture; (5) admission at trial of a videotape without audio or transcript; (6) the government's failure to present bank statements or bank witness testimony associated with the $190,000 worth of deposits into Rosario's bank account; (7) improper sentence enhancement; (8) alteration of the official record; (9) overstatement of her criminal

11

history.  We need not discuss in detail these matters because they are untimely and meritless.

## V.  <u>**Conclusion**</u>

For the foregoing reasons, we will affirm the judgments of the District Court.